**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 21-136-1** |
| | : | |
| **ALEXANDRIA HASSAN** | : | |

# MEMORANDUM

**MURPHY, J.** **November 23, 2026**

In short, here is what happened to Ahmed Hassan, in this order: (i) a jury convicted him of stealing money from the Veterans Affairs Medical Center (VAMC); (ii) he filed a direct appeal; (iii) he received a sentence including a $2,200 special assessment and $565,058.70 in restitution to the VAMC; (iv) he paid $150,000 to the Clerk of Court; (v) the Clerk in turn transferred $2,200 to the Crime Victims Fund and $147,800 to the VAMC; (vi) he reported to prison; and (vii) he died with his direct appeal still pending. After that, the Third Circuit granted the government's motion for a remand, Mr. Hassan's daughter Alexandria took over the case as representative of Mr. Hassan's estate, and Ms. Hassan moved to vacate the judgment and sentence and asked for a refund of the $150,000. The government agreed to the vacatur and refund, but only the $2,200; not the $147,800, supposedly because the funds had already vested in the VAMC and could not be returned. After picking our way through some thorny issues — along the way holding that the Supreme Court abrogated the Third Circuit's rule that restitution is non-refundable, and trying to reconcile the government's clashing arguments here and in D.C. courts — we find ourselves agreeing with Ms. Hassan. Mr. Hassan's estate is entitled to a full refund. We will acknowledge something briefly and then not return to it: we have no enthusiasm whatsoever for returning to Mr. Hassan's estate $147,800 that he assuredly stole from a hospital for veterans. Yet it is necessary, as we hope the following analysis will show.

## I. **<u>Background</u>**

On October 4, 2024, a jury convicted Ahmed Hassan of 22 counts of fraud. DI 108. The indictment stated 25 counts, but the government dismissed one before trial and the jury acquitted on two. DI 1; DI 71-72 (dismissing count 25); DI 108 (acquitting on counts 18 and 19). In collaboration with his paramour,[1] Mr. Hassan stole hundreds of thousands of dollars from his employer,[2] the Veterans Affairs Medical Center (VAMC) in Philadelphia, by using shell companies to bill the VAMC for fake maintenance and construction work. He funneled the money into his own accounts and spent it to better his lifestyle. He also directed some of the stolen money into accounts jointly held with his daughter, Alexandria Hassan.

Mr. Hassan's July 16, 2025 sentence included 64 months imprisonment, restitution to the VAMC in the amount of $565,058.70 (of which, $150,000 was due within 30 days of sentencing), and a $2,200 special assessment. DI 167. At the time, the PSR placed his net worth around two million dollars, mostly in real estate and a retirement account. Mr. Hassan timely filed a notice of appeal. DI 170. On August 21, 2025, Mr. Hassan paid $150,000 to the Clerk of the Court, which covered the special assessment and $147,800 toward what he owed the VAMC. DI 206-1 at 4 (showing his payment in five chunks). Mr. Hassan pointed to that payment in his motion for an extension of the surrender date. DI 177 at 3 ("Finally, he made the initial $150,000 restitution payment within thirty days as required by the Court at sentencing."). On October 17, 2025, the Clerk of the Court, in turn, transmitted $147,800 to the Department of

---

[1] She was convicted by guilty plea and sentenced under separate indictment. *See* No. 21-cr-135 (E.D. Pa.).

[2] The total amount was likely closer to $1.5 million, but the government took a conservative approach at sentencing.

Veterans Affairs. DI 206-1 at 4 (showing the payment in two chunks).

Shortly after, Mr. Hassan died in custody. His counsel promptly filed a motion in the Third Circuit appeal to vacate the briefing schedule. *United States v. Hassan*, No. 25-2388, DI 25 (3d Cir. Nov. 12, 2025) (*Hassan Appeal*). Counsel explained that he expected Ms. Hassan to represent her father's estate and to continue the appeal to challenge the restitution order. *Id.* (citing *United States v. Christopher*, 273 F.3d 294 (3d Cir. 2001), which held that although the conviction will be abated upon death, the restitution obligation will remain). In February 2026, the Third Circuit granted counsel's motion to substitute Ms. Hassan as personal representative and established a briefing schedule. *Hassan Appeal* DI 28, 29, 30.

Ms. Hassan filed an opening brief seeking an order vacating the entire judgment, including the restitution order. *Hassan Appeal* DI 32. Ms. Hassan argued that *Christopher*'s rule that restitution is not punitive and therefore not refundable had been abrogated by *Nelson v. Colorado*, 581 U.S. 128 (2017). *Hassan Appeal* DI 32. The government responded with a motion for summary remand. *Hassan Appeal* DI 42. The government recognized that other circuit courts had agreed with Ms. Hassan's interpretation of *Nelson*, and suggested the relevance of the Supreme Court's recent holding that restitution is criminal punishment for purposes of the Ex Post Facto Clause. *Hassan Appeal* DI 42 at 5 (citing *Ellingburg v. United States*, 146 S. Ct. 564, 567 (2026)). The government concluded: "In light of these developments, the government does not object to the appellant's request that the matter be remanded to the district court with instructions to vacate the indictment and the judgment of conviction and sentence." *Hassan Appeal* DI 42 at 5-6 (adding, somewhat cryptically, that "[t]he government will assess at that time any available civil remedy to retain already-paid

restitution and/or seek further collection of ill-gotten gains.”). The Third Circuit granted the motion for summary remand without comment. *Hassan Appeal* DI 44-1.

The mandate issued in May 2026, returning the case to us. DI 198. Ms. Hassan then moved to vacate the judgment of conviction and sentence, including all financial obligations, and refund the $2,200 special assessment as well as all funds paid for restitution. DI 199. The government conceded the relief sought except “to the extent that it requests a refund of restitution that was paid and disbursed to the VAMC.” DI 201 at 3. The government even conceded that restitution funds should be returned *if still held by the Clerk of Court*. DI 206 at 13. But as to funds already paid by the Clerk to the VAMC, the government argued that “there is no basis for the government to return these funds to the Estate within the context of this criminal case. Rather, the Estate, if it chooses, may pursue its claim for the restitution funds with the VAMC on an administrative level.” DI 201 at 3. Ms. Hassan argues that the government’s directive for Ms. Hassan to go get the money herself contradicts *Nelson*’s holding that “to get their money back, defendants should not be saddled with any proof burden,” because “they are entitled to be presumed innocent.” *Nelson*, 581 U.S. at 137; *see also id.* at 139 (“To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated.”). Thus, we must decide what to do, if anything, about the $147,800 in restitution already paid to VAMC.

## II. Analysis

We begin with our mandate. On appeal, facing the same argument Ms. Hassan makes here, the government said not one word of disagreement. Instead, the government told the Third Circuit that rather than address Ms. Hassan’s argument, the Third Circuit should remand “with

instructions to vacate the indictment and the judgment of conviction and sentence." *Hassan Appeal* DI 42 at 1. That is exactly what the Third Circuit did. On remand, we must avoid addressing issues that were already "expressly or implicitly disposed of by the appellate decision." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 950 (3d Cir. 1985). "A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Id.* at 949. Although the Third Circuit did not write an opinion, there is no way to understand the mandate other than to implement what Ms. Hassan asked for and the government said that it did not object to: vacatur of the indictment, judgment, and sentence. Thus, we must vacate the judgment and sentence in every respect, and that includes any order of restitution.

The next question is what happens when an order of restitution is vacated?[3] The government concedes that no further restitution payments are due, and concedes that a refund would be available of any funds still under control of the Clerk of the Court. DI 201 at 3; DI 206 at 13. But the government argues that it cannot be compelled to retrieve the funds from the VAMC and return them to Ms. Hassan. The answer requires backing up a bit.[4]

---

[3] One possibility that neither party has suggested is: nothing. Arguably, if we adhere to the mandate and vacate the judgment and sentence, we then lose jurisdiction over any dispute about whether the vacatur has the effect of requiring the VAMC to refund Ms. Hassan. But we think the better view (perhaps what the parties are assuming) is that there is a residual adversity sufficient to support Article III standing.

[4] Ms. Hassan complains that the government never told the Third Circuit that it disagreed with Ms. Hassan's argument that the VAMC should refund the restitution payment. That is true. Ms. Hassan asked the Third Circuit for a blanket refund, and did not address what would happen if the victim already had the funds. Ms. Hassan appeared to assume that all funds would be returned, and then victims could pursue "civil remedies" against Mr. Hassan's estate. *Hassan Appeal* DI 32 at 19-20. The government chose its words carefully, not explicitly accepting the premise that already-paid restitution would be refunded by vacatur: "The government will assess

"[W]hen a convicted defendant dies after filing an appropriate appeal but before it is adjudicated, the conviction is abated and the indictment will be dismissed." *Christopher*, 273 F.3d at 295. This is because "when 'death has deprived the accused of his right' to review by a Court of Appeals, 'the interests of justice ordinarily require that he not stand convicted without resolution of the merits of his appeal, which is an integral part of [our] system for finally adjudicating [his] guilt or innocence.'" *Id.* at 296 (quoting *United States v. Moehlenkamp*, 557 F.2d 126, 128 (7th Cir. 1977)).[5] Similarly, "[c]riminal forfeitures and fines are subject to abatement." *Christopher*, 273 F.3d at 297. But when considering restitution orders, the Third Circuit reached a different conclusion. The Third Circuit looked to whether restitution is "penal or compensatory." *Id.* at 298. "A penal provision, such as a fine or criminal forfeiture, abates with the conviction. If viewed as compensatory, a restitution order survives." *Id.* The Third Circuit surveyed the case law, observing for example that it had "held that the purpose of restitution under the Mandatory Victim [Restitution] Act is to compensate victims for their losses and to make them whole." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001). Although the Third Circuit had held that "for *ex post facto* purposes, restitution under the Mandatory Victim Restitution Act is a form of penalty," on balance, "the order of restitution in this case is more compensatory in nature than penal." *Christopher*, 273 F.3d at 298-99 (citing *United States v. Edwards*, 162 F.3d 87 (3d Cir. 1998)).

---

at that time any available civil remedy to retain already-paid restitution and/or seek further collection of ill-gotten gains." *Hassan Appeal* DI 42 at 5-6. Thus, while we cannot applaud the government's "nothing to see here folks" approach at the Third Circuit, we think the mandate does not foreclose this litigation about the VAMC refund.

[5] The rule of abatement appears to be universal. *See United States v. Reynolds*, 98 F.4th 62, 64 n.1 (1st Cir. 2024) (elsewhere in the opinion, exploring the foundations of the rule).

Some years later, the Supreme Court considered the following question: "When a criminal conviction is invalidated by a reviewing court and no retrial will occur, is the State obliged to refund fees, court costs, and restitution exacted from the defendant upon, and as a consequence of, the conviction?" *Nelson*, 581 U.S. at 130. It answered "yes." *Id.* In *Nelson*, the defendant had been convicted "by a Colorado jury of attempting to patronize a prostituted child and attempted third-degree sexual assault by force." *Id.* at 131. The sentence included "costs, fees, and restitution totaling $4,413.00." *Id.* The defendant successfully challenged the conviction on direct review and postconviction review. *Id.* Under Colorado law, "[i]f the conviction is reversed, any restitution order dependent on that conviction is simultaneously vacated." *Id.* at 132, n.3 (citing the relevant Colorado authority). Hence, the Supreme Court made no distinction between restitution and other financial impositions.

In the meantime, pursuant to the sentence, the Colorado Department of Corrections had directed funds from the defendant's inmate account to fees and costs as well as to restitution. *Id.* at 131-32. Eventually, the Colorado Supreme Court held that defendants needed to pursue refunds through Colorado's Exoneration Act, which, as part of the process, required them to prove their innocence by clear and convincing evidence. *Id.* at 132-34. The United States Supreme Court conducted a due process analysis under *Mathews v. Eldridge*, 424 U.S. 319 (1976), concluding that it was impermissible for a state to require defendants to prove their innocence to obtain a refund. *Nelson*, 581 U.S. at 135-38. Hence, "[t]o comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Id.* at 139.

It is not immediately obvious why *Nelson* would overturn *Christopher*'s rule that

restitution is not refundable because it is compensatory. Unlike the Colorado law at issue in *Nelson*, the law of the Third Circuit *does* treat restitution differently. But the reasoning of *Nelson* extends further. The defendants' money belonged to the state only because of the conviction. And once the conviction was erased, and the presumption of innocence restored, the state lost its claim to defendants' money. It is not easy to wall off restitution from the Supreme Court's logic, because in the federal system, conviction triggers the Mandatory Victims Restitution Act. That is likely why several circuits understand *Nelson* to hold that when a conviction is abated, restitution payments also abate. *Reynolds*, 98 F.4th at 72; *United States v. Brooks*, 872 F.3d 78, 89-91 (2d Cir. 2017); *United States v. Douville*, No. 23-4253, 2024 WL 3439434 (4th Cir. 2024); *United States v. Ajrawat*, 738 F. App'x 136, 138 (4th Cir. 2018).[6]

The government, for its part, has not defended the restitution distinction. In *Reynolds*, the First Circuit noted that the government conceded the point. 98 F.4th at 72. Here, too, the government concedes. The government signaled as much at the Third Circuit, citing *Brooks* and *Ajrawat* in its successful motion for remand. And now the government tells us directly that it "does not dispute that if the Clerk held any restitution payment made by the defendant before his death, it must return it." DI 206 at 13. Hearing no opposition, and finding the reasoning sound, we therefore agree with the other circuits and with the government that *Nelson* abrogated *Christopher*'s holding that restitution is not refundable, at least in a case like this one where (i) the conviction is abated upon death of the defendant during pendency of the direct appeal and

---

[6] Other circuits had disagreed with *Christopher* well before *Nelson*. *See, e.g.*, *United States v. Estate of Parsons*, 367 F.3d 409 (5th Cir. 2004) (en banc); *United States v. Koblan*, 478 F.3d 1324 (11th Cir. 2007). Neither the government nor Ms. Hassan has drawn our attention to a circuit decision that agrees with *Christopher* post-*Nelson*.

(ii) the restitution was a dollar-for-dollar repayment to the victim of money stolen by the defendant from the victim. The compensatory-penal distinction drawn by *Christopher* appears immaterial here.[7]

That leaves a final, not insignificant, wrinkle: the Clerk of Court already returned the $147,800 to the VAMC. Unfortunately, the post-*Nelson* cases discussed above do not say what to do in that situation. *See Reynolds*, 98 F.4th at 72 ("[W]e do not take any position on whether the different considerations that might arise where forfeited property had been distributed to victims before a defendant's death would call for a different result, as no suggestion has been made here that any forfeited funds were distributed to victims before Reynolds died."). The government says that means we have neither the obligation nor the power to order the refund, and that "the Estate, if it chooses, may pursue its claim for the restitution funds with the VAMC on an administrative level." DI 201 at 3. Neither party says what that administrative claim might look like, but regardless, Ms. Hassan disagrees, arguing that no further burden may be imposed on the refund under *Nelson*, and that besides, the VAMC is just another pocket of the federal government, so it ought to be within our power to order the refund. DI 202 at 4-8. We take the arguments in turn.

---

[7] Thus, although the parties also rely on *Ellingburg*, we are not so sure that it plays a major role. In *Ellingburg*, the Supreme Court held that restitution is criminal penalty for purposes of the Ex Post Facto Clause. 607 U.S. at 166-67. One might argue that this undermines *Christopher*'s conclusion that restitution is compensatory, but the Third Circuit had already weighed its own earlier holding that "for ex post facto purposes, restitution under the Mandatory Victim Restitution Act is a form of penalty." *Christopher*, 273 F.3d at 298 (citing *Edwards*). Hence, there is no reason to assume that the Third Circuit would rethink *Christopher* just because of *Ellingburg*.

Relying on out-of-circuit cases mostly about pardons,[8] the government argues that "the cases generally hold that restitution, once paid to a victim, cannot be returned." DI 201 at 5-6; DI 206 at 3. Pardon cases are a good analogy for us because like abatement, a full pardon that similarly vacates conviction "releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence." *Ex parte Garland*, 71 U.S. 333, 380 (1866).[9] In *Fordham*, for example, a pardoned defendant had been making restitution payments, but the district court had already distributed the payments to the victims (the Georgia Department of Administrative Services and Great American Insurance Company). 2023 WL 5747709 at *2. The Eleventh Circuit concluded that the pardon discharged the defendant's "obligation to make future restitution payments. But the federal 'government can only release what it holds' . . . . The district court transferred all restitution monies to the victims, so the property rights to those funds have fully vested in the Department and Great American." *Id.* (quoting *Osborn v. United States*, 91 U.S. 474, 477 (1875)). This is an old rule. The government relies on *Knote v. United States*, where the Supreme Court held

---

[8] *E.g., Fordham v. Georgia Dep't of Admin. Servs.*, 2023 WL 5747709, *2 (11th Cir. Sept. 6, 2023); *United States v. Sullivan*, 783 F. Supp. 3d 385 (D.D.C. 2025); *United States v. Ochs*, 2026 WL 1146042, *8 (D.D.C. Apr. 28, 2026); *United States v. Ballenger*, 811 F. Supp. 3d 123, 127-32 (D.D.C. 2025); *United States v. St Cyr*, 804 F. Supp. 3d 1 (D.D.C. 2025); *United States v. Vargas*, 789 F. Supp. 3d 60, 65 (D.D.C. 2025); *United States v. Hager*, 2025 WL 1886135, at *2 (D.D.C. July 3, 2025); *United States v. Sutton*, 2025 WL 2149396, at *2 (D.D.C. July 15, 2025).

The non-pardon cases cited by the government are not as helpful because they involve situations where, as far as we can tell, the original appeal period had run, and the money had gone outside the government. *E.g., United States v. Hayes*, 385 F.3d 1226, 1230 (9th Cir. 2004); *United States v. Washington*, 2023 WL 4145438, *1 (9th Cir. June 23, 2023).

[9] Granted, not all pardons lead to vacatur, and not all pardons or vacated judgments and sentences have the same consequences for all purposes. *See, e.g.*, *United States v. Benton*, 98 F.4th 1119 (D.C. Cir. 2024) (addressing evidentiary consequences).

that a pardon did not entitle a supporter of the Confederacy to reclaim the proceeds of his house, which had been sold, from the United States Treasury. 95 U.S. 149, 149-50 & 154-55 (1877). Fundamentally, this is because once the funds leave control of the court, the President's pardon power "cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress." *Id.* at 149 & 154.

In recent years, confronted with requests for refunds by pardoned defendants whose judgments had been vacated, judges in the United States District Court for the District of Columbia reached different conclusions. Typically in those cases, the direct appeal was still pending and the funds had been deposited in the United States Treasury — not quite the Clerk of the Court and perhaps not quite the VAMC. Some judges relied on *Knote* and concluded that once the money was in the Treasury, it could not be retrieved without an appropriation (and there was no such appropriation). *Sullivan*, 783 F. Supp. 3d at 388-94 (refusing to return forfeited assets); *Ochs*, 2026 WL 1146042 at *8-10 (denying motion for return of restitution, criminal fines, and fees); *Vargas*, 789 F. Supp. 3d at 64-66 (same). Other judges found authority for the appropriation in the Little Tucker Act, 28 U.S.C. § 1346, and payment out of the Judgment Fund, 31 U.S.C. § 1304(a). *Ballenger*, 811 F. Supp. 3d at 129-32; *St Cyr*, 804 F. Supp. 3d at 11-13. These decisions are not easy to reconcile, at least in part because there was no opposing party. In those D.C. pardon cases, government sided with the defendants, taking a position quite similar to Ms. Hassan's in this case. As of this writing, there is a consolidated appeal pending; the lead case is no. 25-3059 (D.C. Cir.). The government is seeking to overturn *Sullivan* and *Vargas*, two cases that the government here says we should follow because they are "well-reasoned." DI 206 at 12. Because the government in the D.C. Circuit is aligned with the

defendants seeking refunds, the D.C. Circuit was forced to appoint amicus counsel to represent the opposing view, *i.e.*, the view the government takes here in opposition to Ms. Hassan.

Having considered the government's arguments in favor of, and against, Ms. Hassan's claim, we think the government has it right. Meaning, the government in the D.C. Circuit appeals, not the government here. To start, we agree that *Knote* does not preclude relief because in *Knote*, the Supreme Court concluded that the pardon, issued after conviction became final, did not itself authorize the return of funds. Here, the starting point is vacatur of the conviction and sentence during direct appeal. Similarly, in our view, the judges in *Ballenger* and *St Cyr* had the right starting point — because they recognized that the pardons at issue were not just pardons, they were pardons that led to convictions being overturned while the direct appeals were pending. *St Cyr*, 804 F. Supp. 3d at 8. And "when one is pardoned while the conviction is on appeal, the appeal becomes moot, and her conviction must be vacated." *Id.* That, in turn, triggers the same rule of *Nelson* we discussed above, restoring to defendant the presumption of innocence requiring a refund of money paid under the sentence.

Although the D.C. Circuit has not yet issued a ruling in the pardon appeals discussed above, the government recently had success with the same argument (meaning, Ms. Hassan's argument) at the Supreme Court. In *Sittenfeld*, the President pardoned the defendant between the time that his conviction had been affirmed by the Sixth Circuit and the filing of a petition for writ of certiorari. *United States v. Sittenfeld*, 2026 WL 2474159, *1-2 (S.D. Ohio, Aug. 24, 2026). In spite of the pardon, defendant pressed on with the petition. He argued, relying on *Knote*, that "the pardon does not return the $40,000 fine Sittenfeld paid. This Court can thus afford concrete relief by reversing the convictions and ordering a refund." Br. for Pet. at 37,

*Sittenfeld v. United States* (no. 25-49). The government disagreed, urging dismissal, persuasively explaining that "if the President grants a defendant a full pardon while his case is still on direct review, the defendant is entitled to the return of any fines that he has paid (either automatically or following a ministerial vacatur of the district court's order requiring payment of those penalties)." Br. for Resp. at 5, *Sittenfeld v. United States* (no. 25-49) (distinguishing *Knote*). Nor was there any "sound reason to conclude that the Appropriations Clause precludes the return of funds when the defendant's conviction is wiped out by a pardon rather than a reversal." *Id.* at 6. That is because "any fine paid by the defendant has not yet vested in the Treasury; instead, in the eyes of the law, it remains under control of the Executive or in the custody of the judicial tribunals, and so must be restored to the defendant upon his full pardon." *Id.* at 5 (quotations omitted). The Supreme Court then promptly vacated judgment and remanded, and eventually the district court ordered the refund of the $40,000. *Sittenfeld*, 2026 WL 2474159 at *3-4 (reiterating that the Appropriation Clause is irrelevant because "the conviction was not yet final, meaning that the monies that Sittenfeld paid had not yet fully vested in the Treasury"). We think the government's arguments were sound in *Sittenfeld* and the district court ultimately reached the correct result.

Although unclear at times, in Ms. Hassan's case, we understand the government to be arguing that even if all of the above is true, the refunds must stop once the money is out of the Clerk of Court's hands and into to other parts of the government. We are not persuaded. The government puts the rabbit in the hat by assuming, rather than proving, that Mr. Hassan's $147,800 "vested" in the VAMC. That word, "vested," comes from *Knote*, where as we pointed out, the conviction had become final. In this context, the right to a direct appeal forestalls

whatever "vesting" the future may hold, because "the interests of justice ordinarily require that [the defendant] not stand convicted without resolution of the merits of his appeal, which is an integral part of our system for finally adjudicating his guilt or innocence." *Christopher*, 273 F.3d at 296 (quotations and brackets omitted). Put another way, the government's claim on the $147,800 was entirely predicated on the conviction, which was not final, was on appeal, and now must be vacated.

Thus, in our view, the VAMC has no valid claim to the $147,800 flowing from the conviction. The government ought to return it. But what of the government's final argument that the VAMC is a stranger that cannot be forced to refund the money (at least, by us in this case)? To review, the government first says that we can order the refund of anything held by the Clerk of the Court — perhaps because the Clerk of the Court is under our control or perhaps because money with the Clerk of the Court is effectively in escrow until it is disbursed. Fair enough. The government next says that we should order the refund of the $2,200 special assessment, even though it has been deposited into the "Crime Victims Fund, a specific U.S. Treasury account." DI 206 at 6 n.3.[10] As Ms. Hassan points out, that is an odd position considering that the DC pardon cases relied upon by the government here say that the Treasury is off limits. *E.g.*, *Sullivan*, 783 F. Supp. 3d at 390-92; *Vargas*, 789 F. Supp. 3d at 64-66 ("[U]nder *Knot*e, the question is not whether the intended recipient is a 'governmental entity.' The only question is whether the funds remain in the custody of an executive agency or the court

[10] The Crime Victims Fund or Crime Victims Restitution Fund was established by Congress in 1984 "as a federal source of funds for programs that compensate and assist crime victims." *See United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990) (citing 42 U.S.C. § 10601(a) (1990), since recodified at 34 U.S.C. § 20101).

system, or whether they have been deposited into the U.S. Treasury."). Yet we think the government's concession on the special assessment is entirely appropriate because, as explained above, we agree with the other government that the Treasury is not off limits in this situation.

That next brings us to the VAMC, where this government draws the line. In all the materials above, we have not identified any sound basis to treat the U.S. Treasury account of the Crime Victims Fund differently than the VAMC. The government says that one difference is that the $147,800 was transferred through "IPAC" to the agency instead of to a Treasury account:

> Unlike a special assessment or criminal fine, that are deposited with the Crime Victims Fund, a specific U.S. Treasury account, the Clerk of Court pays restitution directly to the federal agency, similar to restitution paid to a private victim. Specifically, when the Clerk disburses restitution to a government agency, it transfers the funds electronically through a U.S. Treasury Department portal called "IPAC." The Clerk does not transmit the payment to be held in a general Treasury account. Instead, the Clerk directs the payment to a specific, dedicated agency account through IPAC.

DI 206 at 6 n.3. We fail to see how the mechanism for shifting funds is material. The VAMC, like most any government agency, keeps its money in Treasury accounts. 31 U.S.C. § 3302. So too does the federal agency benefiting from restitution in the D.C. pardon cases, the Architect of the Capitol.[11] *Vargas*, 789 F. Supp. 3d at 65-66; *St Cyr*, 804 F. Supp. 3d at 10 ("[T]he special assessment and restitution St Cyr paid have since been deposited, respectively, in the Crime Victims Fund and an account of the [Architect of the Capitol] — both of which lie in the United States Treasury.").

---

[11] The Architect of the Capitol is the "federal agency responsible for the physical upkeep of the Capitol building and grounds." *Ochs*, 2026 WL 1146042 at *2 (quoting a government submission); *see also* 2 U.S.C. § 1811; Organizational Structure, Architect of the Capitol, https://www.aoc.gov/about-us/organizational-structure.

In another footnote, the government points to a second supposed difference between Mr. Hassan's refundable special assessment and non-refundable restitution, namely that the $2,200 special assessment is under the $10,000 cap of the Little Tucker Act:

> Unlike the $147,800 restitution payment, the government believes authority exists to return the special assessment because it would constitute a claim against the government that is less than $10,000. *See* 28 U.S.C. § 1346(a)(2) (providing district courts jurisdiction over money claims against the United States of $10,000 or less); *United States v. St Cyr*, 804 F. Supp. 3d 1, 11 (D.D.C. 2025).

DI 206 at 5 n.2. If some external authorization is needed for the refunds Ms. Hassan seeks, then that seems like a reasonable approach. But the more compelling authorization is the one the other government is relying on in the D.C. pardon cases: 31 U.S.C. § 1322(b)(2). Here is the other government's persuasive explanation:

> It is correct that the Appropriations Clause provides that "No money shall be drawn from the Treasury but in consequence of appropriations made by law." Article I, Section 9, Cl. 7. Nonetheless, in recognition that the United States government routinely receives funds to which it is not entitled, Congress has included in the general appropriation act for the Department of Treasury language that allows it to refund money erroneously received by the federal government. Specifically, Congress appropriates funds under 31 U.S.C. § 1322(b)(2) for the refund of money erroneously deposited into the Treasury's miscellaneous receipt accounts.
>
> > (b) Except as provided in subsection (c) of this section, necessary amounts are appropriated to the Secretary of the Treasury to make payments from —
> >
> > (2) the United States Government account "Refund of Moneys Erroneously Received and Covered" and other collections erroneously deposited that are not properly chargeable to another appropriation.
>
> 31 U.S.C. § 1322(b)(2). The Department of Treasury has established account 20X1807 to address the refund of monies erroneously received and covered. Specifically, as noted in the Treasury Financial Manuel ("TFM") at Chapter 6, Section 3045:
>
> > When agencies can trace the amount subject to refund as

> erroneously credited to an appropriation account, the agency should charge the refund claim to that appropriation account whether lapsed, current, reimbursable, or nonreimbursable. Agencies may charge account 20X1807 only when depositing collections into the Treasury as miscellaneous receipts and the refund is not properly chargeable to any other appropriation.
>
> Treasury Financial Manual, 6-3045 (available at TFM, last visited on May 27, 2025). *See also Reynolds v. Alabama DOT*, No. 85-cv-665-MHT, 2007 U.S. Dist. LEXIS 100441, at *16-19 (M.D. Ala. Nov. 30, 2007). Thus, if the Court enters an order directing that the fees and restitution be paid to the defendant in this matter, because his conviction was vacated, the Clerk of Court would be authorized under 31 U.S.C. § 3122(b) and 1 TFM 6-3045 to disburse those funds from the designated account.

*United States v. Vargas*, DI 110 at 3-4 in 21-cr-47 (D.D.C. May 27, 2025). We entirely agree and adopt that approach as our own.[12] Some judges, including the judge in *Vargas*, rejected this argument under *Knote* "[b]ecause [defendant]'s payments were collected while his convictions were 'in force,' the funds were not 'erroneously collected' and are therefore not refundable from this account." *Vargas*, 789 F. Supp. 3d at 66 (quoting *Knote*, 95 U.S. at 154). As we have already explained, our view is that *Knote* does not control because the government's claim to Mr. Hassan's funds was not final, and is fully extinguished by the abatement and subsequent vacatur. Hence, by operation of law, the $147,800 was erroneously collected, and can, and should be refunded even though it lies in VAMC's Treasury accounts.

[12] Having reached this point, we should reconsider our jurisdiction. If this were a civil claim against the government, we would have jurisdiction to address up to $10,000. *St Cyr*, 804 F. Supp. 3d at 11-12 (explaining the Little Tucker Act, § 1346(a)(2)). Here, the claim is $150,000, and again, if this were a civil suit, Ms. Hassan would have to seek relief in the Court of Federal Claims under the Big Tucker Act. *See* 28 U.S.C. § 1491(a). But district courts have "jurisdiction to entertain a motion for return of property made after the termination of criminal proceedings against the defendant; such an action is treated as a civil proceeding for equitable relief." *United States v. Chambers*, 192 F.3d 374, 376 (3d Cir. 1999). In this way, we do not view Ms. Hassan's motion as seeking damages (triggering the restrictions of § 1346(a) and § 1491(a)), but rather equitable relief in the form of return of property.

Before concluding, we should address the government's foreboding hypothetical:

> Imagine a case, a not very unusual one, in which a fraudster stole a victim's life savings. A court, upon conviction of the miscreant, would of course order payment of restitution as soon as possible, as authorized by statute, and the clerk, following the court's direction (as in this case), will dutifully transfer amounts paid in restitution to the victim. If the defendant then dies before his appeal is completed, will the court essentially victimize the harmed party again, ordering it on pain of contempt to return those life savings to the thief's estate, leaving the victim as the only recourse a civil action against the estate (which the impoverished victim likely cannot afford)?

DI 206 at 13. We have a few responses to this. First, it's not at all clear that it would be appropriate or permissible to command a refund from a third-party private individual — that is another case for another day. *See Hayes*, 385 F.3d at 1230 n.8. The government is not like private restitution victims, for all the reasons explained above. Second, although it is not necessarily wrong to pay restitution victims promptly, while a direct appeal is pending, it is not required either; for that matter courts could stay restitution payments under Crim. Rule 38(e). *Hayes*, 385 F.3d at 1229-30 & nn. 5,6. Third, while acknowledging our sympathies for the government's hypothetical victim (and for the VAMC) having to sue the estate in civil court to recoup funds, *Christopher* and *Nelson* leave no room for deeming Mr. Hassan anything but free of the conviction and once again presumed innocent.[13] That said, and without speculating about will ultimately happen with Mr. Hassan's estate, we imagine that in many of the government's hypothetical scenarios, it would be a straightforward lawsuit with a predictable result.

---

[13] It is unclear what the limits of *Nelson* are, but this case seems to us comfortably within its bounds. *See Nelson*, 581 U.S. at 148 (Alito, J., concurring) ("It was unnecessary for the Court to issue a sweeping pronouncement on restitution. But if the Court had to address this subject to dispose of these cases, it should have acknowledged that — at least in some circumstances — refunds of restitution payments made under later reversed judgments are not constitutionally required.").

## III. **Conclusion**

Defendant's motion is granted for the reasons explained above and as summarized in the accompanying order. Counts 18, 19, and 25 of the indictment were previously dismissed. All remaining counts of the indictment, *i.e.*, counts 1-17 and 20-24, and the judgment entered against the defendant in this case are dismissed and vacated. Both the $2,200 special assessment and the $147,800 in restitution are refundable.